## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **CRIMINAL NO. PX-19-77** |
| | * | |
| **YAKOV COHEN** | * | **(Conspiracy to Commit Wire Fraud, 18** |
| a/k/a "Jay Collins," | * | **U.S.C. § 1349; Wire Fraud, 18 U.S.C.** |
| a/k/a "Kobi Cohen," | * | **§ 1343; Aiding and Abetting, 18 U.S.C.** |
| **YOSEF HERZOG** | * | **§ 2; Forfeiture, 28 U.S.C. § 2461, 18** |
| a/k/a "Yossi Herzog," | * | **U.S.C. § 981, 21 U.S.C. § 853)** |
| **ORI MAYMON** | * | |
| a/k/a "Or Maymon," | * | |
| a/k/a "Patrick Accardo," | * | |
| **NISSIM ALFASI** | * | |
| a/k/a "Nick Onasis," | * | |
| **ELAD BIGELMAN** | * | |
| a/k/a "Michael Goldberg," | * | |
| **RUNAL JEEBUN** | * | |
| a/k/a "Ryan Jeebun," | * | |
| **SABRINA ELOFER** | * | |
| a/k/a "Mila Morales," | * | |
| **AFIK TORI** | * | |
| a/k/a "Kevin White," | * | |
| a/k/a "Harvey Stone," | * | |
| **ANOG MAAREK** | * | |
| a/k/a "Daniel Buckley," | * | |
| a/k/a "Daniel Marek," | * | |
| a/k/a "Hanog Dany Maarek," | * | |
| **ORON MONTGOMERY** | * | |
| a/k/a "Bill Shnizer," | * | |
| **DAVID BARZILAY** | * | |
| a/k/a "Dave Simpson," | * | |
| **GILAD MAZUGI** | * | |
| a/k/a "Gilad Mazugy," | * | |
| a/k/a "Adam Bloom," | * | |
| a/k/a "Adam Morgan," | * | |
| **HADAS BEN HAIM** | * | |
| a/k/a "Jessica Giovanie," | * | |
| **YOUSEF BISHARA** | * | |
| a/k/a "Yossef Bshara," | * | |
| a/k/a "Omar Alamin," | * | |
| a/k/a "Omar Abdullah," and | * | |
| **NIR EREZ** | * | |
| a/k/a "Jack Cohen," | * | |
| | * | |
| **Defendants** | ******* | |



FILED U.S. DISTRICT COURT DISTRICT OF MARYLAND 2019 SEP 25 P 4: 33 CLERK'S OFFICE BY_____

## FIRST SUPERSEDING INDICTMENT

The Grand Jury for the District of Maryland charges that at times material to this Indictment:

## GENERAL ALLEGATIONS
### Binary Options

1.      A binary option was a type of option contract in which the payout depended on the outcome of a discrete event, typically related to whether the price of a particular asset—such as a stock or a commodity—would rise above or fall below a specified amount.  Unlike standard options, investors in binary options were not being given the opportunity to actually purchase a stock or a commodity but, rather, were effectively predicting whether its price would be above or below a certain amount at a certain time of the day.  The option holder was typically promised that when the binary option expired, the option holder would receive either a pre-determined amount of cash or nothing.

### Relevant Entities

2.      BinaryBook and BigOption were "brands" that sold and marketed binary options to customers located throughout the world, including in the United States and within the District of Maryland.

3.      As described below, the BinaryBook and Big Option brands were operated through a group of related entities including Linkopia (Mauritius) Ltd. ("Linkopia"), Yukom Communications ("Yukom"), Numaris Communications Ltd. ("Numaris"), and other related entities (collectively "the Binary Options Organization").

4.      Linkopia was a Mauritius-based business that provided sales and marketing services, including "conversion services," on behalf of BinaryBook and BigOption through the use of communications by email and by telephone to individuals in the United States, including in the District of Maryland, and elsewhere throughout the world.

a. "Conversion services" were services provided with the objective of converting a prospective binary options customer into an investor and obtaining an initial deposit of funds.

b. A "conversion agent" or "conversion representative" was a salesperson responsible for performing conversion services.

5. Yukom was a business based in Caesarea, Israel that provided sales and marketing services, including "retention services," on behalf of BinaryBook and BigOption through the use of communications by email and by telephone to individuals in the United States, including in the District of Maryland, and elsewhere throughout the world.

a. "Retention services" were services provided with the objective of obtaining additional deposits from investors who had previously made deposits and preventing those investors from withdrawing their money.

b. A "retention agent" or "retention representative" was a salesperson responsible for performing retention services.

c. Retention representatives sometimes referred to themselves as "brokers" or "traders" to potential investors.

6. Numaris was a business based in Tel Aviv, Israel that provided sales and marketing services, including "retention services," on behalf of BinaryBook through the use of communications by email and by telephone to individuals in the United States, including in the District of Maryland, and elsewhere throughout the world.

**Other Relevant Definitions**

7. A "bonus" was an amount of purported funds that representatives of BinaryBook and BigOption could contribute to an investor's account to be used in trading. "Bonuses" were often accompanied by burdensome "turnover" requirements—such as requiring that investors

3

trade 30 times the amount in their accounts before they could withdraw funds—but investors were more likely to lose their money over time as they increased their trading activity.

8.    "Risk-free" or "insured" trades were represented to investors as trades for which investors would be reimbursed for any losses. Investors were often not informed that the reimbursed funds would be in the form of a bonus or about the associated burdensome turnover requirements.

9.    A "chargeback" was the reversal of a credit card charge due to an allegation of fraud by the cardholder.

10.    A "payment service provider" was a third-party company that processed investor deposits or payments.

### The Defendants

11.    Defendant **YAKOV COHEN**, a/k/a "Jay Collins" a/k/a "Kobi Cohen," was a resident of Mauritius. From at least in or about May 2014 through at least in or about September 2017, **COHEN** was a principal of the Binary Options Organization, and had an ownership interest in entities within the Binary Options Organization. **COHEN** supervised the managers of Yukom, Linkopia, BigOption, and BinaryBook, including Defendants **MAYMON**, **ALFASI**, **BIGELMAN**, **JEEBUN**, and others. In correspondence and other communications, **COHEN** identified himself as responsible for "Business Development" for BinaryBook and BigOption. **COHEN** also participated in the selection of marketing campaigns through so-called "affiliate marketers" that were used to solicit and target prospective investors for conversion.

12.    Defendant **YOSEF HERZOG**, a/k/a "Yossi Herzog," was a resident of Israel. From at least in or about May 2014 through at least in or about September 2017, **HERZOG** was a principal of the Binary Options Organization, and had an ownership interest in entities within the Binary Options Organization. **HERZOG** supervised the managers of Yukom, Linkopia,

BigOption, and BinaryBook, including **MAYMON**, **ALFASI**, **BIGELMAN**, **JEEBUN**, and others.

13.     Defendant **ORI MAYMON**, a/k/a "Or Maymon" a/k/a "Patrick Accardo," was a resident of Israel.  From at least in or about June 2014 through at least in or about September 2017, **MAYMON** was a retention representative and eventually a manager at Yukom.  In correspondence and other communications, **MAYMON** identified himself as "Head Broker and V.I.P Account Manager" for BigOption.  **MAYMON** supervised Yukom retention agents and also performed retention services.

14.     Defendant **NISSIM ALFASI**, a/k/a "Nick Onasis," was a resident of Israel.  From at least in or about July 2014 through at least in or about February 2017, **ALFASI** was an employee of Yukom, where he worked as a brand manager for BinaryBook.  In correspondence and other communications, **ALFASI** identified himself as "Branch Manager" for BinaryBook and "Account Manager and Senior Broker" for BigOption.  **ALFASI** supervised Yukom employees who worked as BinaryBook retention agents.  **ALFASI** also performed retention services.

15.     Defendant **ELAD BIGELMAN**, a/k/a "Michael Goldberg," was a resident of Israel.  From at least in or about January 2015 through at least in or about September 2017, **BIGELMAN** was an employee of Yukom, where he worked as a brand manager for BigOption.  In correspondence and other communications, **BIGELMAN** identified himself as "Account Manager" for BigOption.  **BIGELMAN** supervised Yukom employees who worked as BigOption retention agents.  **BIGELMAN** also performed retention services on behalf of BigOption.

16.     Defendant **RUNAL JEEBUN**, a/k/a "Ryan Jeebun," was a resident of Mauritius.  From at least in or about May 2014 through at least in or about December 2016, **JEEBUN** was an employee at Yukom and worked as head of the customer service and internal investigation

departments for BinaryBook and BigOption. In correspondence and other communications, **JEEBUN** identified himself as a "Customer Support Representative" for BinaryBook and "Linkopia Branch Manager." **JEEBUN** supervised representatives of BinaryBook and BigOption who performed conversion and retention services on behalf of BinaryBook and BigOption. **JEEBUN** also supervised the "Finance Department," which determined whether to permit investors to withdraw their funds.

17. Defendant **SABRINA ELOFER**, a/k/a "Mila Morales," was a resident of Israel. From at least in or about October 2015 through at least in or about November 2016, **ELOFER** was an employee at Yukom who worked as a retention agent representing BinaryBook.

18. Defendant **AFIK TORI**, a/k/a "Kevin White" a/k/a "Harvey Stone," was a resident of Israel. From at least in or about August 2014 through at least in or about May 2017, **TORI** was an employee at Yukom who worked as a retention agent representing BigOption and BinaryBook.

19. Defendant **ANOG MAAREK**, a/k/a "Daniel Buckley" a/k/a "Daniel Marek" a/k/a "Hanog Dany Maarek," was a resident of Israel. From at least in or about January 2015 through at least in or about June 2016, **MAAREK** was an employee at Yukom who worked as a retention agent representing BinaryBook and BigOption.

20. Defendant **ORON MONTGOMERY**, a/k/a "Bill Shnizer," was a resident of Israel. From at least in or about October 2014 through at least in or about July 2016, **MONTGOMERY** was an employee at Yukom who worked as a retention agent representing BinaryBook and BigOption.

21. Defendant **DAVID BARZILAY**, a/k/a "Dave Simpson," was a resident of Israel. From at least in or about December 2014 through at least in or about March 2017, **BARZILAY**

was an employee at Yukom who worked as a retention agent representing BinaryBook and BigOption, and as a shift manager inside the Yukom offices in Caesarea.

22. Defendant **GILAD MAZUGI**, a/k/a "Adam Bloom" a/k/a "Adam Morgan," was a resident of Israel. From at least in or about May 2014 through at least in or about September 2017, **MAZUGI** was an employee at Yukom who worked as a retention agent representing BinaryBook and BigOption.

23. Defendant **HADAS BEN HAIM**, a/k/a "Jessica Giovanie," was a resident of Israel. From at least in or about October 2014 through at least in or about August 2016, **BEN HAIM** was an employee at Yukom who worked as a retention agent representing BinaryBook and BigOption.

24. Defendant **YOUSEF BISHARA**, a/k/a Yossef Bshara a/k/a "Omar Alamin" a/k/a "Omar Abdullah," was a resident of Israel. From at least in or about October 2014 through at least in or about March 2017, **BISHARA** was an employee at Yukom who worked as a retention agent representing BinaryBook and BigOption.

25. Defendant **NIR EREZ**, a/k/a "Jack Cohen," was a resident of Israel. From at least in or about April 2015 through at least in or about August 2016, **EREZ** was an employee at Yukom who worked as a retention agent representing BinaryBook and BigOption.

### Relevant Individuals

26. The defendants' co-conspirators included Yukom Chief Executive Officer Lee Elbaz (a/k/a Lena Green), Numaris office manager Ronen Roytman (a/k/a/ Alexander Goldman), Yukom retention agents Lissa Mel (a/k/a Monica Sanders), Austin Smith (a/k/a John Ried), Shira Uzan (a/k/a Emily Laski), Liora Welles (a/k/a Lindsay Cole a/k/a Lindsay Taylor a/k/a Lindsay Wells), and others, including Representatives A through F, who also worked for entities within the Binary Options Organization and represented to customers that they were salespeople and traders for BinaryBook and BigOption.

**The Victims**

27.     The defendants and their co-conspirators targeted victims throughout the world and the United States, including victims in the District of Maryland, including the following:

    a.      Victim A, an investor in BinaryBook, was a resident of Gaithersburg, Maryland, located in the District of Maryland.

    b.      Victim B, an investor in BigOption, was a resident of Laurel, Maryland, located in the District of Maryland.

    c.      Victim C, an investor in BinaryBook, was a resident of Annapolis, Maryland, located in the District of Maryland.

28.     As a result of the scheme, victims worldwide made over $110 million in net deposits, representing losses to investors.

**COUNT ONE**

**(Conspiracy to Commit Wire Fraud)**

The Grand Jury for the District of Maryland further charges that:

29.     Paragraphs 1 through 2̶9̶ *are* realleged and incorporated herein by reference.

30.     Beginning in or about May 2014 and continuing through in or about September 2017, the exact dates being unknown to the Grand Jury, in the District of Maryland and elsewhere, the defendants,

**YAKOV COHEN,**
**a/k/a "Jay Collins,"**
**a/k/a "Kobi Cohen,"**
**YOSEF HERZOG,**
**a/k/a "Yossi Herzog,"**
**ORI MAYMON,**
**a/k/a "Or Maymon,"**
**a/k/a "Patrick Accardo,"**
**NISSIM ALFASI,**
**a/k/a "Nick Onasis,"**
**ELAD BIGELMAN,**
**a/k/a "Michael Goldberg,"**

**RUNAL JEEBUN,**
a/k/a "Ryan Jeebun,"
**SABRINA ELOFER,**
a/k/a "Mila Morales,"
**AFIK TORI,**
a/k/a "Kevin White,"
a/k/a "Harvey Stone,"
**ANOG MAAREK,**
a/k/a "Daniel Buckley,"
a/k/a "Daniel Marek,"
a/k/a "Hanog Dany Maarek,"
**ORON MONTGOMERY,**
a/k/a "Bill Shnizer,"
**DAVID BARZILAY,**
a/k/a "Dave Simpson,"
**GILAD MAZUGI,**
a/k/a "Gilad Mazugy,"
a/k/a "Adam Bloom,"
a/k/a "Adam Morgan,"
**HADAS BEN HAIM,**
a/k/a "Jessica Giovanie,"
**YOUSEF BISHARA,**
a/k/a "Yossef Bshara,"
a/k/a "Omar Alamin,"
a/k/a "Omar Abdullah," and
**NIR EREZ,**
a/k/a "Jack Cohen,"

and others known and unknown to the Grand Jury, did knowingly and intentionally, that is, with

the intent to advance the conspiracy, combine, conspire, confederate, and agree with each other

and others, both known and unknown to the Grand Jury, to commit wire fraud, that is, to knowingly

willfully, and with the intent to defraud, having devised and intending to devise a scheme and

artifice to defraud, and to obtain money and property by means of materially false and fraudulent

pretenses, representations, and promises, knowing such pretenses, representations, and promises

were false and fraudulent when made, transmit and cause to be transmitted by means of wire

communication in interstate and foreign commerce, writings, signs, pictures, and sounds for the

purpose of executing the scheme and artifice in violation of Title 18, United States Code, Section

1343.

**Purpose of the Conspiracy**

31.     It was the purpose of the conspiracy for the defendants and their co-conspirators to obtain the maximum deposit from binary options investors and to take steps to ensure that investors lost the money in their accounts or were otherwise unable to withdraw funds—thereby enriching the defendants, their co-conspirators, and the Binary Options Organization in the process.

**Manner and Means of the Conspiracy**

32.     The defendants and their co-conspirators induced investors to deposit funds based on misrepresentations, including:

     a.     false statements and material omissions regarding the alignment of financial incentives between investors and representatives;

     b.     false statements and material omissions regarding the suitability of binary options as investments and returns on investments in binary options;

     c.     false statements and material omissions about the names, qualifications, and physical location of representatives assisting investors; and

     d.     false statements and material omissions regarding investors' ability to withdraw investment funds and about the reasons that funds could not be withdrawn.

***False Statements and Material Omissions Regarding Alignment of Financial Incentives Between Investors and Representatives of BinaryBook and BigOption***

33.     The defendants and their co-conspirators made or caused to be made materially false statements and failed to disclose material information to binary options investors about whether the financial incentives of representatives of BinaryBook and BigOption were aligned with those of binary options investors.

34.     Representatives of BinaryBook and BigOption, including retention agents **ELOFER**, **TORI**, **MAAREK**, **MONTGOMERY**, **BARZILAY**, **MAZUGI**, **BEN HAIM**, **BISHARA**, and **EREZ**, working under the supervision of **COHEN**, **HERZOG**, **MAYMON**,

10

**ALFASI**, **BIGELMAN**, **JEEBUN**, and others known and unknown to the Grand Jury, claimed to be representing the interests of investors when, in fact, they were not representing the interests of investors. Retention agents falsely told investors and potential investors that they only made money when the investors made money.

35.     In truth and in fact, when investors lost money, **COHEN** and **HERZOG**, as principals of the Binary Options Organization, profited. Retention agents within the Binary Options Organization received commissions based on net investor deposits (i.e., investor deposits minus withdrawals), not investor profits. In other words, retention agents were incentivized and directed to maximize deposits and minimize withdrawals.

36.     However, the defendants and their co-conspirators concealed from investors that they made money on net deposits. The defendants and their co-conspirators also falsely claimed that their financial interests were aligned with those of investors. For example:

    a.     On or about July 16, 2014, **MAYMON** falsely told an investor "I want to work whit [*sic*] your account in bring it hi [*sic*] has [*sic*] we can."

    b.     On or about January 28, 2015, **BIGELMAN** falsely told an investor "my job is to make sure your account will be profitable so we both will make money here."

    c.     In or about August 2015, **EREZ** falsely told an investor that his "profits" came "from your commission," meaning commission on successful trades. **EREZ** also falsely told the investor he was part of an investment team and "Our success rate at the moment are talking [*sic*] between an interest rate of between 20-30%."

    d.     On or about March 3, 2016, **ALFASI** falsely told an investor "our job is to make sure that you're making money."

37.     **HERZOG**, **MAYMON**, **ALFASI**, **BIGELMAN**, **JEEBUN**, **BARZILAY**, and their co-conspirators also trained and encouraged retention agents employed by the Binary Options Organization to make such misrepresentations.  For example:

a.     On or about June 11, 2014, **JEEBUN** circulated email "templates" to be used with customers to **COHEN** and Elbaz that included misrepresentations such as "we, at BigOption, have come up with two amazing offers, which give you the opportunity to maximize profits and reduce losses at the same time"; "you always have a winning hand with BigOption"; and "wishing you a successful trading experience!"

b.     On or about June 29, 2014, Yukom retention agents, along with **ALFASI**, **HERZOG**, **COHEN**, and **JEEBUN**, received a sample of a "mass email to all customers." The email was titled "BigOption Learning Camp" and advertised that investors could "learn the trading tools and strategies that will help you make winning trades."

c.     On or about May 25, 2015, Mel emailed a "Call script" to **MAYMON** that included misrepresentations such as "I'm not here to make you rich in one day or one week - I'm here to make sure that your financial future in trading is secure."

d.     On or about February 25, 2016, Representative A, who was in charge of training at Yukom, emailed a "Call script" to **MAYMON**, **ALFASI**, and **BIGELMAN**. The "script" included various misrepresentations to be made to investors, including that "I am only here to help you generate the profit you want to achieve" and that "my company is very interested in helping you generate the biggest possible profit in the account."

e.     On or about July 18, 2016, Representative B emailed a similar "Call script" to **BIGELMAN** that included the misrepresentation, "[M]y job is to make sure that you make as much money as possible."

f.      On or about August 4, 2016, **BISHARA** sent **MAZUGI** and other Yukom employees a template email in which **BISHARA** falsely claimed to have master's degree in "Economy & Finance" from a U.S. university, that he was "making 83% profit for my clients," and that "within first month of trading, client's account should generate 55-75% profit."

g.      On or about August 23-24, 2016, Elbaz corresponded with Representative C about an upcoming training course for other representatives. On or about August 24, 2016, Representative C sent an email to Elbaz, Roytman, and others attaching a "REVISED" manual for the course, which included a section on addressing "Investor Objections." Among other things, this training manual falsely claimed, "We have a mutual goal here, to make you profits. When you make money, I make money."

h.      **ALFASI** saved a script in his Google Drive entitled "MANY REBUTTALS" that included responses to potential objections from investors. For example, the script included the false claim that "when you make money, we make money," and "[w]hen you don't make money, we actually lose money."

38.     **COHEN**, **HERZOG**, **MAYMON**, **ALFASI**, **BIGELMAN**, **JEEBUN**, and their co-conspirators also trained and encouraged retention agents employed by the Binary Options Organization to maximize investor deposits for the purpose of generating profits for the defendants and their co-conspirators. For example:

a.      On or about May 20, 2015, **BIGELMAN** wrote to BigOption retention agents about reassigning potential investors. As **BIGELMAN** explained, "[y]our job is to call them and to tell the CM [i.e., customer] that the previous broker got promoted and you

are going to handle the account for them." **BIGELMAN** further advised that "[t]here is a lot more money to take from these people."

b. On or about September 29, 2015, Representative D sent an email to other representatives regarding a sales "marathon" in which representatives would compete with one another and be rewarded based upon their ability to obtain investor deposits. Representative D commented in the email, "This is not cemetery here! It's a boiler room! . . . . DON'T LEAVE THE MONEY! JUST TAKE IT!"

c. On or about November 6, 2015, Representative D sent an email to other representatives concerning their employment responsibilities, which, according to the email, included "to squeeze and up-sale the investor."

d. On or about January 26, 2016, Representative E advised other representatives about the use of an "Academy" training session, which was marketed to investors as an educational program designed to improve their ability to successfully trade on their own. Representative E advised others to "[r]emember that the goal is to get them addicted to the platform and having them trade more volume."

e. On or about April 7, 2016, **BIGELMAN** sent an email to a Yukom retention agent with the subject line "[H]ey buddy good job, so far for today!!!!!!! Keep up the good work!!!!!!!!!!!" The text of the email included, "PUSH PUSH PUSH TAKE EVERYTHING THEY GOT."

39. In addition, the defendants and their co-conspirators also concealed from investors that employees of the Binary Options Organization could manipulate the trading platform utilized by BinaryBook and BigOption to alter the likelihood that investors in BinaryBook and BigOption

would be able to profit on trades. That is, the defendants and their co-conspirators concealed from investors that they could make it more or less likely that an investor could lose trades.

40.     The defendants and their co-conspirators requested to have an investor placed on the platform's "high risk" setting to adversely impact the investor's ability to win subsequent trades. The defendants and their co-conspirators used the "high risk" setting in order to attempt to prevent an investor from profiting.

41.     Conversely, the defendants and their co-conspirators requested to have an investor placed on the platform's "low risk" setting to give the client the false impression that he or she was generating significant returns on their investment. The defendants and their co-conspirators used "low risk" to obtain further investments from investors.

a.     For example, on or about January 16, 2015, **BEN HAIM** sent an email to a Yukom manager requesting that a specific investor be "put on low risk."

b.     On or about December 14, 2015, a Yukom retention agent emailed **BIGELMAN** and **MAYMON** and asked that an investor be moved to low risk (increasing his chance of winning trades), because "IT'S A CLIENT THAT HAS MONEY AND WITH SOME SUPPORT I COULD GET HIM FOR A BIG AMOUNT."

### *False Statements and Material Omissions Regarding the Suitability of Binary Options as Investments and Investment Returns*

42.     The defendants and their co-conspirators made or caused to be made materially false statements and failed to disclose material information to binary options investors about the suitability of their investments and about the expected returns on their investments.

43.     In truth and in fact, most investors in BinaryBook and Big Option lost money and the defendants and their co-conspirators knew that it was unlikely, if not impossible, to guarantee success or specific rates of return in any binary options investment.

44.     Yet, the defendants and their co-conspirators, including retention agents **ELOFER**, **TORI**, **MAAREK**, **MONTGOMERY**, **BARZILAY**, **MAZUGI**, **BEN HAIM**, **BISHARA**, and **EREZ**, working under the supervision of **COHEN**, **HERZOG**, **MAYMON**, **ALFASI**, **BIGELMAN**, **JEEBUN**, and others known and unknown to the Grand Jury, concealed from investors that most binary options investors lost money.

45.     The defendants and their co-conspirators also falsely told investors and potential investors that they could expect to see profits if they traded in binary options. For example:

   a.     On or about June 29, 2014 through July 7, 2014, **MAYMON** falsely represented to an investor that "I believe that by the end of the month I will make you 20% - 30% on your account" and that "the average client at [the Elite Trader Group] level could see monthly profits in the $5,000 to $7,000 range."

   b.     On or about January 26, 2015 through January 28, 2015, **BIGELMAN** emailed various investors about signing up for a "managed account," which would involve **BIGELMAN** "making .sure [*sic*] we will make about 15% - 20% profits a month."

   c.     On or about February 10, 2015, in response to a question from an investor, **BIGELMAN** falsely claimed "the min[imum] that we make is 15% a month."

46.     **COHEN**, **HERZOG**, **MAYMON**, **ALFASI**, **BIGELMAN**, **JEEBUN**, and their co-conspirators also trained and encouraged retention agents employed by the Binary Options Organization to make such misrepresentations. For example:

   a.     On or about July 30, 2015, **MAYMON** internally circulated an email template to be used with investors, which included false claims such as an "81% winning rate" and that "we always have great trades for our group and this makes each investor rich, calm and happy."

b.      On or about November 18, 2015, **MAZUGI** emailed **BIGELMAN** and Elbaz asking for their thoughts on an email that regarding a purported trading opportunity that included the claim "I believe this kind of opportunity won't come twice. Let's think about it together, where else can we have a return on our investment of 75% in a period of 4 months??"

c.      On or about November 30, 2015, a Yukom retention agent emailed **MAYMON** and **BIGELMAN** asking for "thoughts" on "[m]ail I sent to clients." The email was titled "BigOption - Pension = safe?" and included representations such as "if you want your savings, pension and retirement money to be safe! All you need to do is to put it in binary account."

d.      The "Call script" circulated to **MAYMON**, **ALFASI**, and **BIGELMAN** by Representative A on or about February 25, 2016, falsely claimed that they "manage around 80 clients which are generating a profit of between 15 – 25 % on a monthly basis"; had an "average success rate of 70%," which would yield a "profit of 19%."

e.      On or about June 3, 2016, **BARZILAY** sent a template email to Yukom employees to send to investors, which falsely claimed a monthly return on investment of "30%" "since early 2015," and that investors "can generate a return on investment (ROI) of 30% on a monthly basis that compounds on its self [*sic*]."

f.      On or about June 6, 2016, Representative A emailed a similar "Call script" to another Yukom employee that included various misrepresentations, including telling investors that they "manage around 80 clients which are generating a profit of between 15 – 25 % on a monthly basis"; that they have a "track record, (success rate) [*sic*] which is

70%" that would yield "an average profit of 19%"; and that "the more funds we have in your account – the bigger the profit."

g.        The "Course manual" sent to Elbaz by Representative C on or about August 24, 2016 included misrepresentations such as "[t]his account will allow [*sic*] to see much higher proceeds than any form of bank in the financial market. (70%-80% Profit per trade)." The manual also included the misrepresentation that "[t]oday I manage around 80 investors which are generating a profit of 15%- 25% on a monthly basis"; that "[t]he way I achieve it for my investors is by relying on a track record of 70%, which means that for each 10 trades, at least 7 will be in the money"; and that "[m]oney makes money, and the more funds you have in your account– the bigger the profit you will be able to make."

h.        **ALFASI** saved a script in his Google Drive entitled "how to work attitude" that advised representatives to falsely state that a purportedly available binary options trading software had "up to 87% success rate."

### *False Statements and Material Omissions Regarding the*
### *Names, Qualifications, and Physical Location of Representatives*

47.      The defendants and their co-conspirators made or caused to be made materially false statements and failed to disclose material information to binary options investors about the true names, qualifications, and physical location of representatives of BinaryBook and BigOption who were purporting to assist investors.

48.      The defendants and their co-conspirators, including retention agents **ELOFER**, **TORI**, **MAAREK**, **MONTGOMERY**, **BARZILAY**, **MAZUGI**, **BEN HAIM**, **BISHARA**, and **EREZ**, working under the supervision of **COHEN**, **HERZOG**, **MAYMON**, **ALFASI**, **BIGELMAN**, **JEEBUN**, and others known and unknown to the Grand Jury, falsely represented to investors that they had training and experience in financial markets and that they had degrees in

finance or related fields. In truth and in fact, the defendants and their co-conspirators had virtually no experience or education in in accounting, trading, or the financial markets.

49.     The defendants and their co-conspirators also concealed the fact that they were calling investors from Israel and falsely claimed to be located in the city of London in the United Kingdom, or in other cities with established financial markets, rather than in Israel.

50.     In addition, the defendants and their co-conspirators concealed their names and true identites from investors and potential investors. For example, **COHEN** used the alias "Jay Collins," **MAYMON** used the alias "Patrick Accardo," **ALFASI** used the alias "Nick Onasis," and **BIGELMAN** used the alias "Michael Goldberg," including when interacting with investors. Such aliases were referred to internally within the Binary Options Organization as "stage names," and Elbaz approved these "stage names."

51.     **COHEN**, **HERZOG**, **MAYMON**, **ALFASI**, **BIGELMAN**, **JEEBUN**, and their co-conspirators also trained and encouraged retention agents employed by the Binary Options Organization to make such misrepresentations. For example:

    a.     The "Call script" sent to **MAYMON**, **ALFASI**, and **BIGELMAN** by Representative A on or about February 25, 2016 included the claim, "[A]s you can probably hear on my voice, I'm not British originally, [*sic*] I'm actually from XXX and I moved to London XXX years ago to complete my Master's degree in Economics from XXX." The "Call script" circulated on or about July 18, 2016 by Representative B to **BIGELMAN** contained similar statements.

    b.     The "Course manual" sent to Elbaz by Representative C on or about August 24, 2016 similarly included the representation to investors that "[a]s you can probably hear by my voice, I am not British originally, I'm actually from _____ and I moved to

London _____ years ago to complete my Master's degree in Economics from

_____."

### *False Statements and Material Omissions Regarding Investors' Ability to Withdraw Funds from Accounts*

52.     The defendants and their co-conspirators made or caused to be made materially false statements and failed to disclose material information to binary options investors about investors' ability to withdraw funds from their accounts.

53.     The defendants and their co-conspirators, including retention agents **ELOFER, TORI, MAAREK, MONTGOMERY, BARZILAY, MAZUGI, BEN HAIM, BISHARA**, and **EREZ,** working under the supervision of **COHEN, HERZOG, MAYMON, ALFASI, BIGELMAN, JEEBUN,** and others known and unknown to the Grand Jury, falsely represented to investors that investors could withdraw funds in their account upon request.

54.     In truth and in fact, the defendants and their co-conspirators took steps to prevent investors from withdrawing funds in their accounts. The defendants and their co-conspirators and concealed from investors that the defendants and their co-conspirators were incentivized and trained to prevent investor withdrawals and made misrepresentations to investors regarding the ability to withdraw investor funds.

55.     **COHEN, HERZOG, MAYMON, ALFASI, BIGELMAN, JEEBUN,** and others also trained and encouraged retention agents employed by the Binary Options Organization to make such misrepresentations.

56.     For example, the "Call script" sent from Representative B to **BIGELMAN** on or about July 18, 2016 included the representation to investors that they "can withdraw [their] money at any point in time." The "script" also included the representation that the investor's money is

"totally liquid—meaning, that if for any reason you need your money back for an emergency, it's literally a click away."

57.    In fact, the defendants and their co-conspirators took steps to prevent certain investors from withdrawing funds, including purported training sessions and placing "bonuses," "risk-free trades," and "insured trades" in an investor's account.

58.    For example, one tactic to prevent withdrawals was to offer investors the use of an "Academy" session that would supposedly provide them with the skills to improve their trading performance by explaining certain market concepts to them. In fact, the information provided in such sessions did not materially improve investors' trading performance.

59.    Another tactic to prevent withdrawals was to put an investor account under investigation to delay the withdrawal while representatives tried to convince the investor to cancel the withdrawal. For example, on or about May 20, 2015, **BIGELMAN** emailed **JEEBUN** about an investor that was seeking a withdrawal and stated, "[w]e need to do what we talked about this week." **JEEBUN** responded, "will get his account under investigation."

60.    In addition to the tactics described above, the defendants and their co-conspirators also used so-called "bonuses," "risk-free trades," and "insured trades" to impede investors' ability to withdraw funds from their accounts. **COHEN**, **HERZOG**, **MAYMON**, **ALFASI**, **BIGELMAN**, **JEEBUN**, and their co-conspirators trained and encouraged retention agents employed by the Binary Options Organization to use "bonuses," "risk-free trades," and "insured trades" to prevent investors from withdraw funds from their accounts and to conceal the nature and purpose of these tactics from investors and to make misrepresentations regarding the nature and purpose of "bonuses," "risk-free trades," and "insured trades." For example:

a. On or about July 15, 2014, **MAYMON** falsely promised an investor that "I guarantee that any time that you'll have bonus in your account you'll be able to withdrawal [sic] your initial investment without complicating things and no questions asked."

b. The "Call script" circulated to **MAYMON**, **ALFASI**, and **BIGELMAN** by Representative A on or about February 25, 2016, claimed that "[t]he bonus is there to help us leverage the account" and that "you can always withdraw your initial investment and the profit but you cannot withdraw the bonus, [sic] it is just there to help us leverage the account." This "Call script" did not include a discussion of any turnover requirement imposed by the "bonus."

c. On or about June 16, 2015, **JEEBUN** informed **BIGELMAN** that an investor seeking to withdraw "is going to get an email from support that she won 5k bonus on the account" in order to prevent the withdrawal. On or about June 22, 2015, **BIGELMAN** sent an update that "[w]e have added the bonus (this is what we spoke about)" but there had been no contact from the investor. **BIGELMAN** concluded, "We will keep on trying to get her to trade."

61. Requests for withdrawals by investors would occasionally be granted, including (1) as a "test withdrawal," designed to encourage an investor to invest more money; and (2) to prevent a "chargeback."

a. First, requests for withdrawals by investors would sometimes be granted in order to retain the investor with the ultimate objective of obtaining more money in the future. The defendants and their co-conspirators concealed the nature and purpose of these "test withdrawals" from investors.

b.     For example, on or about July 4, 2016, Representative F, who worked in the "Finance Department," wrote an email to **JEEBUN**, **BIGELMAN**, **MAYMON**, and other representatives about "test" withdrawals. Representative F wrote, "[I]t is a good thing to send [the customer] funds without applying any charges in view of getting more deposits from that [customer] in the future."

c.     Second, requests for withdrawals by investors would sometimes be granted in order to prevent credit card chargebacks, because payment service providers would refuse to work with companies with high chargeback ratios. Payment service providers were necessary for accepting credit card deposits. Withdrawals were sent when it was determined there was a high risk of a chargeback in order to help preserve relationships with the payment service providers.

d.     For example, on or about May 26, 2015, **BIGELMAN** explained to **JEEBUN** that he had approved a withdrawal request because "we couldn't get the CM [customer] over the phone so I guess I didn't wanted [*sic*] to risk with CB [chargeback]."

### Overt Acts in Furtherance of the Conspiracy

62.     The defendants and their co-conspirators communicated by email and telephone with victims throughout the world and the United States, including victims in the District of Maryland. In addition to the overt acts described above, the defendants and their co-conspirators committed the additional overt acts:

a.     On or about August 28, 2015, Smith, on behalf of BinaryBook, emailed Victim A with bank wire-transfer instructions in order for Victim A to send additional money as an investment.

b.     On or about January 7, 2015, **BEN HAIM**, on behalf of BigOption, emailed Victim B in an effort to solicit additional investments from Victim B.

23

c. On or about March 10, 2015, Welles, on behalf of BigOption, emailed Victim B about speaking further about trades place in Victim B's account.

d. On or about December 7, 2015, Uzan, on behalf of BinaryBook, emailed Victim C in order to solicit additional investments from Victim C.

18 U.S.C. § 1349

## COUNTS TWO THROUGH FOUR
### (Wire Fraud)

The Grand Jury for the District of Maryland further charges that:

63. Paragraphs 1 through 2~~8~~ *cec* and 32 through 62 are realleged and incorporated herein by reference.

64. Beginning in or about May 2014 and continuing through in or about September 2017, the exact dates being unknown to the Grand Jury, in the District of Maryland and elsewhere, the defendants,

**YAKOV COHEN,**
**a/k/a "Jay Collins,"**
**a/k/a "Kobi Cohen,"**
**YOSEF HERZOG,**
**a/k/a "Yossi Herzog,"**
**ORI MAYMON,**
**a/k/a "Or Maymon,"**
**a/k/a "Patrick Accardo,"**
**NISSIM ALFASI,**
**a/k/a "Nick Onasis,"**
**ELAD BIGELMAN,**
**a/k/a "Michael Goldberg,"**
**RUNAL JEEBUN,**
**a/k/a "Ryan Jeebun,"**
**SABRINA ELOFER,**
**a/k/a "Mila Morales,"**
**AFIK TORI,**
**a/k/a "Kevin White,"**
**a/k/a "Harvey Stone,"**
**ANOG MAAREK,**
**a/k/a "Daniel Buckley,"**
**a/k/a "Daniel Marek,"**

a/k/a "Hanog Dany Maarek,"
**ORON MONTGOMERY,**
a/k/a "Bill Shnizer,"
**DAVID BARZILAY,**
a/k/a "Dave Simpson,"
**GILAD MAZUGI,**
a/k/a "Gilad Mazugy,"
a/k/a "Adam Bloom,"
a/k/a "Adam Morgan,"
**HADAS BEN HAIM,**
a/k/a "Jessica Giovanie,"
**YOUSEF BISHARA,**
a/k/a "Yossef Bshara,"
a/k/a "Omar Alamin,"
a/k/a "Omar Abdullah," and
**NIR EREZ,**
a/k/a "Jack Cohen,"

aiding and abetting and being aided and abetted by each other and others known and unknown to the Grand Jury, did knowingly and willfully, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, pictures, and sounds for the purpose of executing the scheme and artifice.

**Purpose**

65.    The Grand Jury realleges and incorporates by reference paragraph 31 of this Indictment as a description of the purpose of the scheme and artifice.

**Manner and Means**

66.    The Grand Jury realleges and incorporates by reference paragraphs 32 through 62 of this Indictment as a description of the manners and means of the scheme and artifice.

<u>**Use of the Wires**</u>

67.    On or about the dates set forth below, in the District of Maryland and elsewhere,

the defendants,

**YAKOV COHEN,**
**a/k/a "Jay Collins,"**
**a/k/a "Kobi Cohen,"**
**YOSEF HERZOG,**
**a/k/a "Yossi Herzog,"**
**ORI MAYMON,**
**a/k/a "Or Maymon,"**
**a/k/a "Patrick Accardo,"**
**NISSIM ALFASI,**
**a/k/a "Nick Onasis,"**
**ELAD BIGELMAN,**
**a/k/a "Michael Goldberg,"**
**RUNAL JEEBUN,**
**a/k/a "Ryan Jeebun,"**
**SABRINA ELOFER,**
**a/k/a "Mila Morales,"**
**AFIK TORI,**
**a/k/a "Kevin White,"**
**a/k/a "Harvey Stone,"**
**ANOG MAAREK,**
**a/k/a "Daniel Buckley,"**
**a/k/a "Daniel Marek,"**
**a/k/a "Hanog Dany Maarek,"**
**ORON MONTGOMERY,**
**a/k/a "Bill Shnizer,"**
**DAVID BARZILAY,**
**a/k/a "Dave Simpson,"**
**GILAD MAZUGI,**
**a/k/a "Gilad Mazugy,"**
**a/k/a "Adam Bloom,"**
**a/k/a "Adam Morgan,"**
**HADAS BEN HAIM,**
**a/k/a "Jessica Giovanie,"**
**YOUSEF BISHARA,**
**a/k/a "Yossef Bshara,"**
**a/k/a "Omar Alamin,"**
**a/k/a "Omar Abdullah," and**
**NIR EREZ,**
**a/k/a "Jack Cohen,"**

and others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute the aforesaid scheme to defraud, knowingly caused to be transmitted by means of wire communications in interstate commerce, writings, signs, signals, pictures, and sounds, to wit:

| Count | Date | Description |
|-------|------|-------------|
| 2 | On or about August 28, 2015 | Email from Austin Smith on behalf of BinaryBook to Victim A with bank wire-transfer instructions, through interstate and foreign commerce and while Victim A was in the District of Maryland |
| 3 | On or about March 10, 2015 | Email from Liora Welles on behalf of BigOption to Victim B about speaking further regarding trades placed in Victim B's account, through interstate and foreign commerce and while Victim B was in the District of Maryland |
| 4 | On or about December 7, 2015 | Email from Shira Uzan on behalf of BinaryBook to Victim C soliciting additional investments, through interstate and foreign commerce and while Victim C was in the District of Maryland |

18 U.S.C. § 1343
18 U.S.C. § 2

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

68.     Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with 28 U.S.C. § 2461(c), in the event of the defendants' conviction under any of Counts One through Four of this Indictment.

69.     As a result of the offenses charged in Counts One through Four of this Indictment, the defendants,

**YAKOV COHEN,**
**a/k/a "Jay Collins,"**
**a/k/a "Kobi Cohen,"**
**YOSEF HERZOG,**
**a/k/a "Yossi Herzog,"**

**ORI MAYMON,**
a/k/a "Or Maymon,"
a/k/a "Patrick Accardo,"
**NISSIM ALFASI,**
a/k/a "Nick Onasis,"
**ELAD BIGELMAN,**
a/k/a "Michael Goldberg,"
**RUNAL JEEBUN,**
a/k/a "Ryan Jeebun,"
**SABRINA ELOFER,**
a/k/a "Mila Morales,"
**AFIK TORI,**
a/k/a "Kevin White,"
a/k/a "Harvey Stone,"
**ANOG MAAREK,**
a/k/a "Daniel Buckley,"
a/k/a "Daniel Marek,"
a/k/a "Hanog Dany Maarek,"
**ORON MONTGOMERY,**
a/k/a "Bill Shnizer,"
**DAVID BARZILAY,**
a/k/a "Dave Simpson,"
**GILAD MAZUGI,**
a/k/a "Gilad Mazugy,"
a/k/a "Adam Bloom,"
a/k/a "Adam Morgan,"
**HADAS BEN HAIM,**
a/k/a "Jessica Giovanie,"
**YOUSEF BISHARA,**
a/k/a "Yossef Bshara,"
a/k/a "Omar Alamin,"
a/k/a "Omar Abdullah," and
**NIR EREZ,**
a/k/a "Jack Cohen,"

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to such violation.

**Substitute Assets**

70.    If, as a result of any act or omission of any defendant, any proceeds subject to forfeiture:

      a.    cannot be located upon the exercise of due diligence;

b.     have been transferred or sold to, or deposited with, a third party;

c.     have been placed beyond the jurisdiction of the court;

d.     have been substantially diminished in value; or

e.     have been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States of America, pursuant to 21 U.S.C. § 853(p), to seek forfeiture

of any other property of said defendants up to the value of the forfeitable property.

18 U.S.C. § 981
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

ROBERT ZINK
Chief
Criminal Division, Fraud Section
United States Department of Justice

L. RUSH ATKINSON, Trial Attorney
CAITLIN R. COTTINGHAM, Trial Attorney
Criminal Division, Fraud Section
United States Department of Justice

A TRUE BILL:

**SIGNATURE REDACTED**

Foreperson

Date: 9/25/2019